**UNITED STATES of America, Appellee,**

**v.**

**Pascal BALLISTREA, Defendant–Appellant.**

**No. 56, Docket 95–1578.**

United States Court of Appeals, Second Circuit.

Argued Sept. 10, 1996.

Decided Nov. 25, 1996.

---

828

James P. Harrington, Harrington & Mahoney, Buffalo, NY, for defendant-appellant.

Paul J. Campana, Asst. U.S. Atty., Buffalo, NY (Patrick H. NeMoyer, U.S. Atty., Marc S. Gromis, Asst. U.S. Atty., Buffalo, NY, on the brief), for appellee.

Before: NEWMAN, Chief Judge, LUMBARD and CALABRESI, Circuit Judges.

JON O. NEWMAN, Chief Judge:

The primary question on this appeal is whether a defendant can be convicted of "defrauding" an agency of the United States under the general federal conspiracy statute, 18 U.S.C. § 371, if he did not contact agency personnel or submit documents to the agency. The question arises on an appeal by Pascal Ballistrea from the September 26, 1995, judgment of the District Court for the Western District of New York (Richard J. Arcara, Judge), convicting him, after a jury trial, of five counts arising under substantive provisions of the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 et seq., two counts of conspiracy to defraud an agency of the United States, 18 U.S.C. § 371, and one count of making a

false statement to the United States, 18 U.S.C. § 1001. We conclude that defendant was properly convicted of conspiracy to defraud the Food and Drug Administration ("FDA") because he conspired with others to interfere with or obstruct the FDA's lawful function of regulating the interstate distribution of medical devices and new drugs by deceit, trickery, and dishonest means. We also conclude that defendant's numerous challenges relating to trial proceedings, jury charge, and sentencing are without merit. However, we vacate defendant's conviction under 18 U.S.C. § 1001 because the element of materiality was not submitted to the jury as required by *United States v. Gaudin*, — U.S. —, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), as interpreted in *United States v. Ali*, 68 F.3d 1468, 1474–75 (2d Cir.1995).

## Background

In the late 1980s, Life Energy Resources, Ltd. ("LER"), a New York corporation, began conducting the business of ordering, storing, and distributing a variety of health-related devices and products through a multi-level marketing network. LER's marketing plan provided that members of the general public could purchase its products only through an official LER distributor, or by becoming LER distributors themselves. Each potential distributor had to be sponsored by an existing distributor and was required to sign a distributorship agreement with LER stating that he or she would not make medical claims or use unofficial literature or marketing aids to promote LER products. Distributors profited both from the price differential between LER's sale price to them and their sale price to customers, and from sales made by other distributors whom they had originally sponsored—in the amount of five percent of the "downstream" distributors' gross sales.

Appellant Ballistrea and his partner Michael Ricotta were at the top of the LER distribution network. They formed a partnership under the name East Coast Marketing that sold LER products directly to end users and sponsored downstream distributors. Additionally, Ballistrea, who had years of experience in multi-level distribution

schemes, helped to set up LER's distribution system at the company's founding. For his efforts, LER awarded him one percent of all gross commissionable sales.

Two products sold by LER were the REM SuperPro Frequency Generator ("REM") and the Lifemax Miracle Cream ("Miracle Cream"). The REM, which sold for $1,350 to distributors, was a small box powered by electricity that ran currents through the feet and body of the user. It was officially described by LER as a "pulse generating instrument." The Miracle Cream was described by LER as an "excellent moisturizer and skin softener," but "possibly much more." Like all LER products, the REM and the Miracle Cream came with a disclaimer stating that they were not to be used for the "cure, treatment, mitigation, prevention, or diagnosis of diseases." These products were sold by LER until July 1990, when their sales and distribution were transferred to a newly formed corporation named New Millennium. New Millennium used the same multi-level marketing format as LER, and Ballistrea and Ricotta became distributors for this company upon its establishment.

The evidence showed that Ballistrea and Ricotta distributed literature and audiotapes to many potential downstream distributors and customers—some of whom were undercover Government agents—touting the REM and the Miracle Cream as having medicinal effects. Some materials, for instance, claimed that pulse stimulation devices such as the REM could cure cancer, staph infections, and other serious diseases. Other literature claimed that the Miracle Cream could alleviate the discomforts of premenstrual syndrome and reverse the effects of osteoporosis. Both Ballistrea and Ricotta also personally told many potential purchasers, including several who were gravely ill or had sick relatives and friends, about the alleged curative powers of these products.

Ballistrea and his partner knew that the REM and the Miracle Cream were not FDA approved and sought to conceal their activities from the Government. Their knowledge of the inappropriateness of their acts is demonstrated both by the distributorship agreement explicitly forbidding LER distributors

from making medical claims concerning LER products and by a LER newsletter notifying all distributors to stop using unofficial literature to tout the curative powers of LER products. Additionally, both Ballistrea and Ricotta told undercover Government agents, posing as potential downstream distributors, that they should use the unofficial literature to market the products, especially to customers who were ill, but should take great care to ensure that their use of this information is not discovered by the FDA. Ballistrea stated on a training video for LER phone operators that they should be careful about touting LER products as medical aids to callers because "it could be the FDA calling." Ballistrea also informed an undercover postal inspector that he helped to set up New Millennium to distribute the REM and the Miracle Cream because of concerns that the FDA was acting against LER and its distributors for improperly distributing these products.

Ballistrea and Ricotta were tried separately. Ricotta was convicted of conspiring to defraud the FDA and of violating various provisions of the FDCA and sentenced to 41 months' imprisonment. Ballistrea was convicted on two counts of conspiracy to defraud the FDA (one for the REM and one for the Miracle Cream), 18 U.S.C. § 371, five counts of introducing unapproved medical devices and new drugs into interstate commerce, 21 U.S.C. §§ 331(a) & 333(a)(1), and one count of making a false statement to federal officials, 18 U.S.C. § 1001. Ballistrea was also sentenced to 41 months' imprisonment.

Discussion

I. Conspiring to Defraud the United States

■ Ballistrea contends that the Government failed to prove the conspiracy to defraud the FDA charges because there was no evidence of "actual or active contact" between him or Ricotta and the FDA or its agents. We reject this argument because the defraud prong of the federal conspiracy statute does not require such a showing of actual contact.

The general federal conspiracy statute punishes a conspiracy that has either of two objects: "to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371. Ballistrea was charged under section 371 both with conspiracy to defraud the FDA, by interfering with its lawful function of regulating the interstate distribution of medical devices and drugs, and with conspiracy to violate specific sections of the FDCA prohibiting the introduction of unapproved medical devices and drugs into interstate commerce. Count I concerned the REM and charged a conspiracy with two objectives: to defraud the FDA and to violate substantive provisions of the FDCA. Count IX concerned the Miracle Cream and similarly charged a dual-object conspiracy. In each count, the conspiracy to defraud the FDA constituted a felony, though the conspiracy to violate substantive provisions of the FDCA constituted a misdemeanor because a violation of these substantive provisions constituted a misdemeanor. See id. The jurors specifically indicated on the verdict form that they found Ballistrea guilty on both aspects of the conspiracies charged in Counts I and IX.

■ A conspiracy to defraud under section 371 embraces "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." Dennis v. United States, 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966) (quotations and citations omitted). Although neither this provision nor its predecessors "were accompanied by any particularly illuminating legislative history," Tanner v. United States, 483 U.S. 107, 128, 107 S.Ct. 2739, 2751, 97 L.Ed.2d 90 (1987), it is well established that the term "defraud" as used in section 371 "is interpreted much more broadly than when it is used in the mail and wire fraud statutes," United States v. Rosengarten, 857 F.2d 76, 78 (2d Cir.1988), and that this provision "not only reaches schemes which deprive the government of money or property, but also is designed to protect the integrity of the United States and its agencies." United States v. Nersesian, 824 F.2d 1294, 1313 (2d Cir.1987). Thus, this section covers acts that "interfere with or obstruct one of [the United States'] lawful governmen-

tal functions by deceit, craft or trickery, or at least by means that are dishonest," even if the Government is not "subjected to property or pecuniary loss by the fraud." *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). Moreover, so long as deceitful or dishonest means are employed to obstruct governmental functions, the impairment "need not involve the violation of a separate statute." *Rosengarten*, 857 F.2d at 78. We thus agree with the Ninth Circuit's summary of the four elements of a section 371 conspiracy-to-defraud offense: "[T]he government need only show (1) [that defendant] entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993).

Ballistrea's contention that the required element of "obstruction" or "interference" must involve actual contact between the defendant and the Government agency—for instance, through the making of misrepresentations to agency officials or the submitting of false information to the agency—finds no support in the case law. In *Nersesian*, for instance, a defendant conspired with others to structure bank transactions so that no individual transaction involved more than $10,000. 824 F.2d at 1309–16. This was done with the knowledge that financial institutions were required by law to report all transactions over this threshold amount to the IRS.[1] However, it was undisputed that the defendant, as an individual bank customer, had no legal duty to report transactions over $10,000 and had no contact with IRS

officials. Nonetheless, the Court concluded that because "it is imperative that reports be submitted by financial institutions" in order for the IRS's lawful function of monitoring financial transactions to operate properly, if defendant and his associates "agreed to interfere with and to obstruct this lawful function of the IRS, they could properly be charged with a violation of the 'defraud prong' of § 371." *Id.* at 1313. Despite the lack of any evidence of actual contact between the defendant and the IRS or its agents, the Court upheld defendant's conviction. *Id.* at 1315. Other cases have similarly upheld convictions under section 371's defraud prong without a showing of contact between the defendant and the Government agency. *See, e.g., United States v. Hurley*, 957 F.2d 1, 4 (1st Cir.1992) (defendants who merely laundered client's ill-gotten gains properly convicted of conspiring to defraud IRS on ground that money laundering activity "inevitably hinder[ed]" IRS's ability to collect client's taxes); *United States v. Bilzerian*, 926 F.2d 1285, 1302 (2d Cir.1991) (defendants properly convicted of conspiring to defraud SEC and IRS by agreeing to fail to submit information to agency; evidence of defendants' "mere failure to comply with a regulatory requirement to provide information" sufficient to sustain conviction); *United States v. Gurary*, 860 F.2d 521, 525 (2d Cir. 1988) (defendants created and sold phony invoices to third party that used this information on its tax returns; mere fact that defendants knew that false information could have been used by third party on its tax returns sufficient to sustain section 371 conviction for defrauding IRS, even if defen-

1. In *Ratzlaf v. United States*, 510 U.S. 135, 149, 114 S.Ct. 655, 663, 126 L.Ed.2d 615 (1994), the Supreme Court held that the "structuring" offense punished by 31 U.S.C. § 5322(a)—the act of breaking up a single transaction above a financial institution's reporting threshold into two or more separate transactions—includes as an essential element the defendant's knowledge that the structuring was unlawful. *Ratzlaf* overruled this Circuit's prior construction of the federal antistructuring statute. *See, e.g., United States v. Scanio*, 900 F.2d 485, 491 (2d Cir.1990) (proof that defendant knew that structuring is unlawful not required to satisfy section 5322's willfulness requirement).

Although *Nersesian* suggests an interpretation of the antistructuring statute later repudiated by *Ratzlaf, see Nersesian*, 824 F.2d at 1314–15, the aspect of *Nersesian* relevant to the present case—its discussion of the scope of 18 U.S.C. § 371's defraud prong—is unaffected by *Ratzlaf*. At least to the extent that *Nersesian* upheld a section 371 conspiracy to defraud the IRS without requiring evidence of contact with the IRS, its analysis remains valid. Whether, in light of *Ratzlaf*, a knowledge requirement concerning the unlawfulness of structuring must be imported into a section 371 conspiracy to defraud the IRS by structuring a transaction is a further issue that we do not decide.

dants did not intend to commit tax fraud by selling invoices to third party).

The Government proved at trial that Ballistrea and Ricotta—with knowledge that their marketing scheme was in contravention of the law—repeatedly instructed persons to whom they had sent unauthorized literature touting the medicinal powers of the REM and the Miracle Cream to conceal their use and possession of this information because the FDA might discover their unlawful activity. Moreover, Ballistrea helped to organize and became a distributor in a new company—New Millennium—formed to sell these products because the FDA began to investigate LER's distribution of the REM and the Miracle Cream. Although the creation of New Millennium ultimately failed to throw the FDA off Ballistrea's scent, such evidence of active concealment and evasion is more than sufficient to establish that Ballistrea agreed with Ricotta and others to obstruct, through deceit, trickery, or dishonest means, the FDA's lawful function of regulating the marketing and distribution of medical devices and drugs in the United States. *See United States v. Sturman,* 951 F.2d 1466, 1474 (6th Cir.1991) (upholding conviction for conspiring to defraud IRS where defendant conspired with others to conceal his assets by, among other things, opening Swiss bank accounts under assumed names and channeling money among shell corporations); *United States v.*

*Klein,* 247 F.2d 908 (2d Cir.1957) (defendants properly convicted of conspiring to defraud IRS where they obstructed its function of assessing and collecting taxes by organizing numerous foreign corporations to hide their income).

The cases cited by Ballistrea to support his reading of the conspiracy statute are inapposite, for they do not involve convictions under the "defrauding" prong of 18 U.S.C. § 371, but convictions under 21 U.S.C. § 333(a)(2), which governs violations of 21 U.S.C. § 331(a) (prohibiting the introduction of unapproved medical devices and drugs into interstate commerce) committed with an "intent to defraud or mislead" either end users or Government agencies.[2] *See, e.g., United States v. Arlen,* 947 F.2d 139, 141 (5th Cir. 1991); *United States v. Mitcheltree,* 940 F.2d 1329, 1345 (10th Cir.1991); *United States v. Bradshaw,* 840 F.2d 871, 872 (11th Cir.1988); *United States v. Industrial Lab. Co.,* 456 F.2d 908, 910 (10th Cir.1972). Because the concept of "defrauding" under 21 U.S.C. § 333(a)(2) has not been as broadly construed as its linguistically identical counterpart in 18 U.S.C. § 371, cases requiring the Government to show actual contact between the defendant and a Government agency or its officials to sustain a conviction under the former provision are irrelevant to the present case.[3]

**2.** Prior to 1988, section 333(a)(2) was designated as section 333(b).

**3.** One reported decision does contain language supporting Ballistrea's interpretation of section 371's defrauding prong. In *United States v. Haga,* 821 F.2d 1036 (5th Cir.1987), the Court found that a variance existed between the offense for which defendant was indicted and that for which he was convicted. Although the trial court clearly convicted defendant under the defrauding prong of section 371, the language of the indictment was somewhat ambiguous as to whether defendant was charged under this prong or the specific offense prong of section 371. The indictment charged defendant with conspiring "to commit offenses against the United States, to wit, violations ... of Title 21, United States Code, Sections 301–392," in violation of 18 U.S.C. § 371. *Id.* at 1038.

Noting that indictments under the defrauding prong "ordinarily describe[ ] clear interference and active contact with governmental agency

functions" and allege "more than completely external interference with the working of a governmental program or disregard for federal laws," *id.* at 1040, the Fifth Circuit concluded that the defendant was indicted under the specific offense prong of section 371. *Id.* at 1043; *see id.* at 1041 ("[F]or a section 371 'conspiracy to defraud' conviction to stand, the essence of the conspiracy must at least involve a showing of more than inadvertent contact with a governmental agency or incidental infringement of government regulations...."). Because the variance between the offense of indictment and the offense of conviction was not harmless, the defendant's conviction was vacated.

Because the language from *Haga* is found in a factual and legal context significantly different from that of the present case, it is difficult to speculate whether the Court in *Haga* would have found that Ballistrea's active concealment of his illicit activities from FDA regulators constituted mere "external interference with governmental agency functions" or "inadvertent contact with a governmental agency."

## II. Jury Charge Claims

Ballistrea challenges several aspects of the jury instructions. With the exception of his argument directed toward the District Judge's charge on the 18 U.S.C. § 1001 count, we find defendant's contentions to be without merit.

### 1. 18 U.S.C. § 1001

 Ballistrea contends that the District Judge erred by not providing a specific instruction to the jury on the element of materiality in the charge on Count VIII, which alleged that defendant made a false statement to FDA investigators. Because defendant did not object to this charge at trial, this Court's review will be for plain error. *United States v. Tillem*, 906 F.2d 814, 826 (2d Cir.1990).

The false statement at issue was made by defendant to Government investigators during the execution of a search warrant at defendant's home that resulted in the seizure of literature and tapes touting the REM and the Miracle Cream as having medicinal powers. Defendant declared in a signed statement that he had not distributed the seized materials for more than one year. At the time of the statement, Government officials had ample evidence that this statement was false. Defendant does not now contend that the statement was true.

In his instructions to the jury on the section 1001 count, the District Judge first read the language of this provision, which provides that whoever "knowingly and willfully falsifies, conceals or covers up by any trick, scheme or devise a material fact" shall be guilty of this offense. However, the District Judge did not identify materiality as an element and listed only the following four as "essential elements" of the section 1001 offense: that defendant (1) knowingly and willfully (2) made a statement, (3) which was false, and (4) which was within the jurisdiction of an agency of the United States. Indeed, during a post-trial hearing on this very issue, the Judge acknowledged that he "did not require the jury to find that the alleged false statement was material" because he had followed then-controlling Second Circuit law in this matter. *See United States v. Elkin*, 731 F.2d 1005, 1009 (2d Cir.1984) (materiality not element of section 1001 offense). After an independent review of the jury instructions, we agree with the District Judge that he did not charge materiality as an element of the section 1001 count.

In *United States v. Gaudin*, —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), decided after Ballistrea's trial, the Supreme Court held that materiality, *if* an element of the section 1001 offense, must be submitted to the jury. Because the Government in *Gaudin* conceded that materiality was an element of section 1001, the Court did not directly consider this question. In *United States v. Ali*, 68 F.3d 1468, 1474–75 (2d Cir.1995), this Circuit explicitly read *Gaudin* as holding that materiality is an element of the section 1001 offense and repudiated our earlier decision in *Elkin*. If the jury charge given by the District Judge in Ballistrea's case were given today, therefore, it would be erroneous under the law of this Circuit.[4]

---

**4.** Our recent decision in *United States v. Klausner*, 80 F.3d 55 (2d Cir.1996) does not affect this case. Distinguishing *Gaudin*, the Court held that the issue of the materiality of a false statement must be submitted to the jury *only* if the determination of materiality "require[s] the resolution by the jury of 'subsidiary questions of purely historical fact.'" *Klausner*, 80 F.3d at 60 (citation omitted). Such questions included: "(a) 'what statement was made?'; and (b) 'what decision was the agency trying to make?'" *Id.* at 59–60 (quoting *Gaudin*, —— U.S. at ——, 115 S.Ct. at 2314). Because "materiality" in the tax statute at issue in *Klausner* is defined as "essential to the accurate computation of the clients' taxes"—and because *any* false deduction necessarily and invariably results in inaccurate computation of taxable income—the Court concluded that the materiality of the defendant's false deductions was a question of law properly decided by the trial judge. *Id.* at 61.

*Klausner* recognized, however, that where it is necessary to make factual determinations as to what statement was made by the defendant and what decision the agency was trying to make, the question of materiality must be submitted to the jury. *Id.* Indeed, the Court explicitly noted that although the issue of materiality in many statutes is a question of law for the judge, the "'exception has been section 1001 cases, in which we have held that it is an element of the crime that must be determined by the jury.'" *Id.* at 60 (quoting *United States v. Taylor*, 66 F.3d 254, 255 (9th Cir.1995)); *see also Taylor*, 66 F.3d at 255 ("[W]hen the element of materiality requires a

■ Because defendant did not timely object to the section 1001 charge, this Court can reverse only for "plain error." Fed. R.Crim.P. 52(b). In *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993), the Supreme Court interpreted Rule 52(b) as creating three distinct hurdles for appellate review. First, there must be error. Second, the error must be "plain," which at a minimum means "clear under current law." Third, the plain error must "affect[ ] substantial rights," which requires a showing of prejudice. *Id.* at 732–34, 113 S.Ct. at 1776–77. Generally, the defendant will bear the burden of persuasion as to prejudice.

■ The first two *Olano* requirements are easily met. First, as a result of *Gaudin* and *Ali*, the jury charge was erroneous. Second, the error was plain because it is clear under "current law," meaning the law existing at the time of the appeal. *United States v. Viola*, 35 F.3d 37, 42 (2d Cir.1994); accord *United States v. Ross*, 77 F.3d 1525, 1539 (7th Cir.1996). The third requirement is also satisfied. As this Court held in *Viola*, where the error at issue was unclear at the time of trial but becomes clear on appeal because a "supervening decision alters a settled rule of law in [this] circuit, . . . the burden of persuasion as to prejudice (or, more precisely, lack of prejudice) is borne by the government, and not the defendant." 35 F.3d at 42. In this case, the Government has failed to show that Ballistrea was not prejudiced by the District Judge's clear error in failing to instruct the jury on an essential element of the section 1001 offense.[5] We therefore vacate the section 1001 conviction.

### 2. Jury Charge on Counts I and IX

■ Defendant complains that the District Judge's charge on the two conspiracy counts was confusing and created the possibility that the jury, while finding the evidence sufficient to convict him only under

the misdemeanor prong of the two counts, mistakenly convicted him under the felony "defrauding" prong. Because defendant did not timely raise this objection, we review for plain error, *Tillem*, 906 F.2d at 826, and conclude that no such error has been committed.

As discussed earlier, each of the section 371 counts charged a conspiracy with two objectives: a felony conspiracy to defraud the FDA and a misdemeanor conspiracy to violate a specific FDCA provision. Although defendant implies that this manner of charging, in and of itself, is improperly duplicitous, this Circuit has approved the use of such indictments. *See, e.g., United States v. Southland Corp.*, 760 F.2d 1366, 1369 (2d Cir.1985); *United States v. Williams*, 705 F.2d 603, 624 (2d Cir.1983).

Our review of the record leads us to conclude that no possibility of prejudice resulted to defendant from the District Court's charge on Counts I and IX. Simply put, the District Judge, specifically and separately, discussed the elements of felony conspiracy to defraud and the elements of misdemeanor conspiracy to violate provisions of the FDCA. He also repeatedly distinguished the felony conspiracy aspect from the misdemeanor conspiracy aspect in both counts. Such explication adequately eliminates the risk of misunderstanding, *cf. Williams*, 705 F.2d at 624, and the specificity of the verdict form provides additional assurance. *See United States v. Orozco–Prada*, 732 F.2d 1076, 1083 (2d Cir. 1984). There was no plain error in the District Judge's jury instructions.

### 3. Responsible Party

■ Defendant contends that the District Judge erred in refusing his request to instruct the jury that a required element of all the FDCA-related offenses was that defendant was a "legally responsible party," *i.e.*, someone with sufficient authority to seek

factual finding, as it does in section 1001 prosecutions, that element must be submitted to the jury.") (quotations and citations omitted).

5. In the section 1001 context, a false statement is "material" if it has the natural tendency to influence or be capable of affecting the Government's

action. *See, e.g., Klausner*, 80 F.3d at 59; *United States v. Hubbard*, 16 F.3d 694, 698 (6th Cir. 1994), rev'd in pt. on other grounds, —— U.S. ——, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995); *United States v. Lopez*, 728 F.2d 1359, 1362 (11th Cir. 1984).

FDA approval or registration for the REM and the Miracle Cream. To prevail, defendant must show that his requested charge accurately stated the governing law and that the charge as given prejudiced him. *United States v. Dove*, 916 F.2d 41, 45 (2d Cir.1990). We conclude that no error was committed by the District Court.

Defendant erroneously reads *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), to stand for the proposition that *only* "responsible parties" can be found guilty of violating specific provisions of the FDCA. In that significant decision, the Supreme Court upheld the conviction of Park, the CEO of a nationwide retail food chain with 36,000 employees, 874 retail outlets, and 16 warehouses, for FDCA-related offenses at one of the company's warehouses in Baltimore. Park had personally done nothing directly related to the charged offenses, but instead had been indicted solely for his role as CEO of the company. In upholding his conviction, the Court noted that because the FDCA had dispensed with "the need to prove 'consciousness of wrongdoing,'" *id.* at 669, 95 S.Ct. at 1910, Park's lack of *mens rea* was no defense. The Court also held, however, that because the FDCA prescribed a strict liability offense, a "limiting principle" was needed. The principle it settled upon—the basis of Ballistrea's claim in the instant case—was that only persons who have a "responsible share in the furtherance of the transaction which the statute outlaws" could be held strictly liable for violating the FDCA. *Id.* Because the jury charge required the jury to find that Park had the authority and responsibility to rectify or prevent the situation leading to the charged offenses, the Court upheld his conviction. *Id.* at 674, 95 S.Ct. at 1912.

*Park* is irrelevant to the present case, however, because the Government did not prosecute Ballistrea for *failing to prevent* a violation of the FDCA by third parties under his authority. Rather, it prosecuted him for personally violating the FDCA by his own conduct of causing unapproved medical devices and drugs to be introduced into interstate commerce.

The relevant statutory provisions clearly cover defendant's conduct:

The following acts and the causing thereof are prohibited:

(a) the introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.

21 U.S.C. § 331(a). The statute makes no distinction as to whether the person who has personally introduced or caused the introduction of an unapproved or unregistered product into commerce is a "responsible party." The penalty provision governing this section also makes no such distinction: "Any person who violates a provision of section 331 ... shall be imprisoned ... or fined...." As one court has put it, "it is unnecessary to go beyond the plain language of the statute. 'Any' means any." *United States v. General Nutrition, Inc.*, 638 F.Supp. 556, 563 (W.D.N.Y.1986) (upholding FDCA convictions of store clerk and assistant manager); *see also United States v. Acosta*, 17 F.3d 538 (2d Cir.1994) (upholding conviction of retail store owner for conspiracy to distribute adulterated drugs in violation of 21 U.S.C. § 331 and 18 U.S.C. § 371); *United States v. Tuente Livestock*, 888 F.Supp. 1416, 1427 (S.D.Ohio 1995) ("Congress has directly indicated that a party who has purchased an adulterated article from another party and who, in turn, passes it on to another, may yet be liable under § 331(a).").

*Park* held that parties charged with failing to prevent violations of the FDCA can be convicted only if they held positions of authority enabling them to rectify or prevent the violations; it did not impose a similar requirement of responsible party status when the defendant is charged with personally violating the FDCA by his own conduct of introducing, or causing the introduction of, unapproved devices and drugs into interstate commerce. The District Court's refusal to accede to defendant's charge request was not erroneous.

III. Defense Witness Immunity

Defendant contends that the District Court erred in denying his request to the Court to require the Government to

grant immunity to two high-level LER officials whom defendant wished to call as witnesses. In *United States v. Turkish*, 623 F.2d 769, 777 (2d Cir.1980), this Court noted that the Fifth Amendment does not require "that defense witness immunity must be ordered whenever it seems fair to grant it." In *United States v. Bahadar*, 954 F.2d 821, 826 (2d Cir.1992), we clarified our three-prong test for determining whether to direct the Government to grant immunity to a defense witness. To impose such a requirement upon the Government, a district court must find that: (1) the Government has "engaged in discriminatory use of immunity to gain a tactical advantage"; (2) the witness's testimony is "material, exculpatory, and not cumulative"; and (3) the testimony "must be unobtainable from any other source." *Id.* at 826.

Nothing in the record indicates that the Government had granted immunity to its witnesses, and refused to grant immunity to defendant's witnesses, in order to gain a tactical advantage. Moreover, there is no indication that the testimony sought by defendant would have been exculpatory or even relevant. Defendant's hope in seeking this testimony was to show that these witnesses, and not the defendant, were the parties responsible for seeking FDA approval and registration for the REM and the Miracle Cream. As noted previously, however, defendant was not charged with failing to prevent violations of the FDCA by third parties who neglected to register or seek FDA approval for these products, but with personally introducing or causing the introduction of these products into interstate commerce. The mere fact that these witnesses might *also* be liable for violations of the FDCA under *Park* is not relevant to the issue of defendant's own guilt. The District Court properly declined to order the Government to grant immunity to defendant's witnesses.

## IV. Jury Deliberations

 Defendant contends that improper oral communication occurred between the jury, the District Judge, and the prosecutor. The complaint concerns a request by the jury to hear certain tape recordings introduced into evidence and the attempt by the prosecutor and the District Judge to ascertain the precise extent of the jury's request through oral colloquy.

Although the District Court did not fully comply with the procedures outlined in *United States v. Ronder*, 639 F.2d 931, 934 (2d Cir.1981), no reversible error was committed. *See United States v. Adeniji*, 31 F.3d 58, 65 (2d Cir.1994) (substantial compliance with *Ronder* procedures is sufficient). The episode in this case largely concerned administrative matters, and was certainly no more egregious than conduct found to be harmless in *Tillem*, 906 F.2d at 826–27 (rejecting defendant's challenge based on trial judge's "offhand" comment to jury defining difference between extortion and bribery) and *United States v. Ulloa*, 882 F.2d 41, 45 (2d Cir.1989) (finding substantial compliance with *Ronder* despite fact that "trial judge repeatedly entertained oral questions and responded to them without seeking the views of counsel as to appropriate responses"). Moreover, the District Judge in the present case carefully followed the advice of this Court in *Ulloa*—that when the judge's attempt to clarify the jury's oral inquiries is leading to an extended colloquy, the jury should return to the jury room and submit further inquiries in writing. *Id.* at 45.

## V. Sentencing

 Defendant makes a number of objections to his sentence, all of which are without merit. We discuss defendant's objection to the two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice, however, because the conduct giving rise to this enhancement—a false statement made to FDA investigators during the execution of a search warrant at defendant's home—also underlies his conviction under 18 U.S.C. § 1001, which we vacate in this opinion. Although defendant's materiality claim is successful in the section 1001 context, it does not bar a Guidelines enhancement.

 Even if we assume that the definition of materiality is the same in both contexts, the question of whether the false statement is material for the purpose of the obstruction enhancement, unlike the seem-

ingly similar question in the section 1001 context, is a question expressly for the sentencing judge, and not the jury, to decide. Therefore, although the failure to instruct the jury on materiality voids conviction on the section 1001 count, there is sufficient basis to support the Court's finding of materiality and its imposition of an obstruction of justice enhancement.

## Conclusion

We reject Ballistrea's remaining contentions without discussion. For the foregoing reasons, defendant's convictions for conspiracy to defraud the FDA and for violating substantive provisions of the FDCA are affirmed. His conviction under 18 U.S.C. § 1001 is vacated. We remand this case to the District Court for entry of a revised judgment.